**IRONSHORE SPECIALTY INSURANCE COMPANY, Plaintiff**

v.

**ASPEN UNDERWRITING LIMITED; and Dornoch, Ltd., Defendants.**

**Civil Action No. 7:12–cv–33–JRN.**

United States District Court, W.D. Texas, Midland–Odessa Division.

Signed April 29, 2014.

Christine Bergeron Alphonso, Randell E. Treadaway, Zaunbrecher Treadaway, LLC, Covington, LA, Michelle M. O'Daniels, Zaunbrecher Treadaway, Metairie, LA, for Plaintiff.

David J. Plavnicky, Chester J. Makowski, Plavnicky Kinzel & Makowski, LLP, Houston, TX, for Defendants.

## AMENDED ORDER

JAMES R. NOWLIN, District Judge.

Before the Court is Plaintiff's Motion for Summary Judgment (Dkt. No. 34), Defendants' Motion for Summary Judgment (Dkt. No. 25), Plaintiffs Response to Defendants' Motion for Summary Judgment (Dkt. No. 33), Defendants' Response to Plaintiffs' Motion for Summary Judgment (Dkt. No. 37), and Plaintiffs' Reply to Defendants' Response to Plaintiffs Motion for Summary Judgment (Dkt. No. 42).

## I. BACKGROUND

The dispute now before this Court arises out of an incident involving a flash fire that took place on August 19, 2010 at the Herren 5–8 # 4 in Martin County, Texas. (Dkt. No. 21 at ¶ 16). The well was owned and operated by Endeavor Energy Resources, L.P. ("Endeavor"). (*Id.*). At the time the fire occurred, one of Endeavor's affiliates, Exxcel Well Service, Inc. ("Exxcel"), was performing a work over of the operations of the well. (*Id.* at ¶ 18). To assist in that effort, Exxcel contracted with an organization called Basic Energy Services L.P. ("Basic") to provide services and generally assist Exxcel in its work over of the Herren # 4 well. (*Id.*). The contract called for Basic to do things like provide a tank truck loaded with brine water or provide a pump truck to pump the brine water into the well. (*Id.*). Exxcel and Basic spelled out the various terms and conditions of their new relationship in a master services agreement ("MSA"). (*Id.*). In the MSA, both parties agreed to defend and indemnify each other and their subsidiaries for all "claims, demands, and causes of action," asserted by or on behalf of their respective employees for bodily injury or death (except in cases involving claims of gross negligence or willful misconduct). (*Id.*). To support this agreement, but as a separate and independent obligation, the MSA requires Basic to: (1) obtain primary liability insurance coverage in the amount of $1 million; (2) obtain excess insurance coverage in the amount of $4 million; (3) have its primary and excess insurance policies endorsed to name Endeavor and Exxcel as additional insureds; (4) have the policies endorsed to waive subrogation against Endeavor and Exxcel; and (5) have the policies endorsed to be primary and non-contributory with any other liability insurance available to Endeavor and Exxcel for any occurrence, ac-

cident, or claim arising out of personal injuries to or the death of Basic employees. (Dkt. No. 34–1 at 5–6).

On August 19, 2010, a fire broke out and two Basic employees—Abel Garcia and Fernando Zamora—were killed. (*Id.* at 4–5). Their families subsequently filed suit against Basic, Exxcel, and Endeavor[1] for damages arising out of the deaths of their loved ones. (*Id.*).

At the time the accident occurred, Basic had three layers of liability insurance coverage in effect: (1) a primary Commercial General Liability Policy issued by National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), which provided a $1 million per occurrence limit of liability ("the Basic Primary Policy"); (2) a first layer excess liability insurance policy subscribed to by Aspen and other subscribing underwriters, which provided a $10 million limit of liability ("the First Layer Excess Policy"); and (3) a second layer excess liability insurance policy subscribed to by defendant, Dornoch, and other subscribing underwriters, which provided a $40 million limit of liability ("the Second Layer Excess Policy"), which was excess of the First Layer Excess Policy. (*Id.*). Endeavor also had three layers of liability insurance coverage in effect at the time of the accident: (1) a primary Commercial General Liability Policy issued by National Union, which provided a $1 million per occurrence limit of liability ("the Endeavor Primary Policy"); (2) a Commercial Excess Liability insurance policy issued by Plaintiff, Ironshore, which provided a $10 million limit of liability ("the Ironshore Excess Policy"); and (3) a second layer excess liability insurance policy issued by Axis Surplus Insurance Company, which provided a $10 million limit of

liability excess of the Ironshore Excess Policy. (*Id.*).

Basic's First and Second Layer Excess policies both contain identical definitions of "Insured" and "Insured Contract." The policies define "Insured" as "any person or entity to whom the 'Insured' is obliged by a written 'Insured Contract' entered into before any relevant 'occurrence' and/or 'claim' to provide insurance such as afford by this policy but only with respect to . . . liability arising out of operations conducted by the named 'Insured'. . ." (Dkt. No. 25 at 13). Both policies define "Insured Contract" as "any written contract or agreement entered into by the 'insured' and pertaining to business under which the 'insured' assumes the tort liability of another party . . ." (*Id.* at 13–14).

On October 28, 2010, after the lawsuits were filed, Endeavor/Exxcel informed Basic's primary insurance provider, National Union, of the Endeavor/Exxcel lawsuits. (Dkt. No. 34–1 at 6–7). National Union acknowledged that it was contractually obligated to provide coverage to Endeavor/Exxcel and the insurance company appointed counsel to defend Endeavor/Exxcel against the underlying lawsuits. (*Id.*).

The dispute that gave rise to this case began in April of 2011. (*Id.* at 7). After settlement negotiations yielded offers well in excess of the limit of the National Union Primary Policy and the First Layer Excess Policy, Endeavor/Exxcel, along with Plaintiff Ironshore, made a demand on Basic's excess insurers for coverage up to the full limits of liability provided by the First and Second Layer Excess policies. (*Id.*). In other words, Endeavor/Exxcel and Plaintiff argued that they were entitled to up to $51 million of coverage from Basic's

---

1. Hereafter, Endeavor and Exxcel will be referred to as a single entity ("Endeavor/Exxcel").

insurers under the First and Second Layer Excess Policies.[2]

While Defendants acknowledged a limited contractual obligation to provide some coverage to Endeavor/Exxcel, they had a dramatically different understanding than did Plaintiff as to the scope of their contractual obligation to Endeavor/Exxcel. Pointing to the underlying MSA (which both parties concede is the "insurance contract" in this case), Defendants took the position that Endeavor/Exxcel were entitled to a total of $5 million in coverage—$1 million from the primary policy and $4 million from the First Excess Policy. (Dkt. No. 25).

Plaintiff Ironshore is one of Endeavor/Exxcel's insurance providers that found itself on the hook for any damages not covered by Basic's insurers pursuant to Basic's indemnity obligations under the MSA. Hoping to avoid a hefty bill, Plaintiff filed a Complaint for Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 et seq. and Rule 57 of the Federal Rules of Civil Procedure seeking a judicial determination of the total amount of "OTHER INSURANCE" available to Endeavor/ Exxcel under the First Layer Excess Policy and under the Second Layer Excess Policy issued to Basic. (Dkt. No. 21). Since that original filing, both sides have filed motions for summary judgment (Dkt. Nos. 25 and 34).

## II. STANDARD OF REVIEW

The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);

*Washburn v. Harvey,* 504 F.3d 505, 508 (5th Cir.2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Washburn,* 504 F.3d at 508.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary-judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations are not competent summary-judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 343 (5th Cir.2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary-judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.,* 465 F.3d 156, 164 (5th Cir.2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit

---

**2.** Since both parties acknowledge that the relevant contractual language at issue in this case is identical in both the First and Second Layer Excess policy contracts, the Court will hereafter refer to the two policies as a single umbrella policy.

under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

## III. ANALYSIS

■ Plaintiff makes two arguments in support of its desired outcome in this case. First, it argues that precedent precludes the Court from looking at the underlying contract and as a result, the only conclusion the Court can draw from the language of the insurance policy is that Defendants intended to provide all of the coverage available to Basic under the First and Second Layer Policies. As a secondary argument, Plaintiff argues that even if the Court considers the MSA, Defendants' intent is nevertheless ambiguous and therefore, the Court must construe the policy in favor of the insured. For reasons set out below, the Court rejects both of Plaintiff's arguments.

### A. *ATOFINA and Aubris Do Not Preclude the Court from Examining the MSA*

Plaintiff both misunderstands and misapplies the cases upon which it relies. Examination of the MSA and the insurance policies makes clear that Basic intended its insurers to provide Endeavor/Exxcel up to $5 million of liability coverage and no more.

■ In Texas, insurance contracts are subject to the same rules of construction that are applied to other contracts. *Am.*

*Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir.2001); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex.1995); *Upshaw v. Trinity Cos.*, 842 S.W.2d 631, 633 (Tex. 1992). When interpreting insurance policies, courts strive to give effect to the parties' intent and read all parts of the contract together. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). "Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together." *One Beacon Ins. Co. v. Crowley Marine Services, Inc.*, 648 F.3d 258, 267 (5th Cir.2011), citing 11 Williston on Contracts § 30:25 (4th ed.1999). "Texas's doctrine of incorporation by reference is relaxed." *In re Enron Corp.*, 391 F.Supp.2d 541, 582 n. 45 (S.D.Tex.2005). A contract may be incorporated into an insurance policy consistent with the intent of the parties. *Urrutia v. Decker*, 992 S.W.2d 440, 442 (Tex.1999) (citations omitted).

■ As is clear from the above discussion, where a policy contract expressly refers to another instrument, the Court should and must refer to the other instrument as part of the contract itself if the Court determines that the parties intended the documents to be read together. Three Fifth Circuit cases further illustrate how courts have handled interpretational issues like one involved in this case. The first such case is *LeBlanc v. Global Marine Drilling Co.*, 193 F.3d 873, 875 (5th Cir. 1999). In *LeBlanc*, the Fifth Circuit looked to an underlying contract in order to determine the extent of the coverage provided to an additional insured. *Id.* In *LeBlanc*, the additional insured provision at issue made a contractor an additional insured "to the extent Subcontractor as-

sumes liability hereunder and agrees to indemnify Contractor ..." *Id.* The Fifth Circuit found that the extent of coverage afforded to an additional insured is limited to the indemnity obligation owed by the named insured, as set out in the underlying contract since "[t]he language of indemnification defines the parameters of the agreement regarding assured status." *Id.*

Along the same lines, in *Certain Underwriters at Lloyd's London v. Oryx Energy Co.*, an insurance policy provided that "any ... corporation ... and/or entity for whom or with the Assured may be operating is hereby named as additional assured *when required.*" 142 F.3d 255, 258 (5th Cir.1998) (emphasis added). In evaluating how much coverage the Plaintiff was entitled to, the court examined the policy and the underlying contract together and ultimately determined that additional insured coverage extended only to the extent of the indemnity obligations set out in the underlying contract. *Id.*

The final case directly relevant to the matter before this Court is *Becker v. Tidewater, Inc.*, 586 F.3d 358, 370 (5th Cir. 2009). In *Becker,* an insurance policy referenced an underlying contract by defining "Assured" as a person to whom the "Named Assured" was obligated by contract to name. *Id.* In order to answer the question of how much coverage the defendants agreed to provide, the Fifth Circuit read the umbrella policy and the underlying contract it referenced side by side. *Id.* After reviewing the limiting language of the underlying contract's insurance provision, the court found that the contract expressly limited coverage to risks assumed by the named insured under the terms of the underlying contract. *Id.*

Taken together, *LeBlanc, Certain Underwriters,* and *Becker* show that, at least as of 2009 (when the Circuit handed down

*Becker* ), the Fifth Circuit had not created, recognized, or employed any sort of common law prohibition against looking to the language of an underlying contract in order to determine how much coverage the parties intended to provide. Plaintiff nevertheless argues that the Texas Supreme Court dramatically altered the rules of the game in 2008, when it handed down its decision in *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660 (Tex.2008). Plaintiff further contends that the Fifth Circuit acknowledged as much when it handed down *Aubris Resources LP v. St. Paul Fire & Marine Insurance Co.*, 566 F.3d 483 (5th Cir.2009). Plaintiff claims that, taken together, these two cases established a universal rule that absolutely bars the Court from considering the MSA's language in order to decide how much coverage the parties intended to provide one another. For reasons set out in detail below, the Court rejects Plaintiff's readings of these cases, as well as its suggestion that the Court may not and should not consider the underlying contract alongside the umbrella policy in order to determine the scope of each party's coverage obligation.

Most of the fundamental flaws in Plaintiffs arguments derive from a flawed understanding of the Texas Supreme Court's holding in *ATOFINA.* In *ATOFINA,* a property owner sought coverage under a contractor's excess policy for liability associated with the death of one of the contractor's employees. *ATOFINA,* 256 S.W.3d at 661. The contractor entered into a service contract with an owner that contained separate independent indemnity and additional insured clauses. *Id.* While the indemnity clause exempted the contractor from any liabilities related to the owner's sole negligence, the additional insured clause included no limitations on or references to the indemnity clause. *Id.* at

662–63. The issue before the Court was "whether a commercial umbrella insurance policy that was purchased to secure the insured's indemnity obligation in a service contract with a third party also provides direct liability coverage for the third party." *Id.* at 662.

Before explaining what the Court actually did in *ATOFINA,* it is worth pausing to highlight the differences between the contract that was before the Texas Supreme Court in *ATOFINA* and the one before the Court in this case. First, it is noteworthy that the contract before the Texas Supreme Court in *ATOFINA* did not reference any underlying contract. Here, however, both parties concede that the umbrella policy specifically refers to an "insurance contract." Additionally, both parties in this case agree that the "insurance contract" that the umbrella policy refers to is the MSA. Both parties further concede that the Court *must* examine the MSA in order to answer the question of whether Endeavor/Exxcel is entitled to any coverage. While Plaintiffs contend that this Court should look at the MSA to decide whether Endeavor/Exxcel is a covered entity, Plaintiff conveniently argues that *ATOFINA* categorically prohibits the Court from considering the language of the MSA in order to evaluate *how much* coverage the parties intended to provide one another. What Plaintiffs argument gainsays, however, are the important differences between the contract at issue in *ATOFINA* and the one before the Court in this case. The reason the *ATOFINA* Court refused to look beyond the four corners of the umbrella policy had nothing to do with any rule against referring to other documents. Instead, the *ATOFINA* court limited the scope of its inquiry to the policy itself because the policy in that case did not refer to any outside documents. In light of this fact, it is hardly surprising or remarkable that the *ATOFINA* court

limited its inquiry to "the terms of the umbrella insurance policy itself." *Id.* at 664. This case, however, involves a contract that *does* expressly refer to an outside document: an "insurance contract." Accordingly, the facts that lead the ATO-FINA court to limit the scope of its analysis to the four corners of the insurance policy itself do not apply to this case.

Once one understands why *ATOFINA* does not prohibit this Court from examining the umbrella policy and the insurance contract it incorporates in tandem, Plaintiffs reliance on *Aubris* becomes less persuasive because Plaintiff's understanding of *Aubris* is predicated on what the Court has shown to be a faulty reading of *ATO-FINA.* The *Aubris* court addressed whether an insurer had a duty to defend an additional insured (property owner) in a tort claim, or whether that duty was abrogated by an indemnity exclusion in a services agreement between the owner and its contractor, the primary insured. The court held that the owner was entitled to a defense of the underlying tort claim. 566 F.3d at 490. In evaluating the extent of *Aubris'* additional insured coverage, the court considered "the relationship between and among the policy, the additional insured provision in the services agreement, *and* the indemnity provision in the services agreement." 566 F.3d at 487 (emphasis added). Plaintiff contends that the *Aubris* court limited its review solely to the insurance policy, but, in fact, the exact opposite is true—the court clearly distinguished the additional insured provision from the general indemnity provision in the underlying services agreement. More specifically, the services agreement in *Aubris* attempted to exclude any coverage for obligations which the owner "specifically agreed to indemnify Contractor." 566 F.3d at 487 (emphasis deleted). Despite this fact, the court recognized that the services agreement only

provided for general indemnity. *Id.* So, contrary to Plaintiff's claims, the *Aubris* court actually construed the additional insured agreement as requiring a *specific agreement* between the parties for indemnity with respect to the specific underlying tort claim at issue in the case. The court determined that no such specific agreement existed and, accordingly, found that there was no coverage.

The insurance policy before the Court is this case looks nothing like the one that was at issue in *Aubris.* The pivotal difference between the *Aubris* insurance provision and the one presently before the Court is that the *Aubris* insurance provision was separate from and additional to the general indemnity agreement, and therefore, the *Aubris* indemnity provision had no bearing on the scope-of-coverage question. *Id.* The MSA in this case does not contain a separate and additional indemnity provision. Instead, Basic's insurance obligations are clearly identified and expressly spelled out in the underlying MSA, making the document not only relevant to, but indeed, a part of the contract itself.

## B. *Defendants Intended to Provide up to $5 million of Liability Coverage to Endeavor/Exxcel*

Since neither *ATOFINA* nor *Aubris* force the Court to limit its analysis to the insurance policy exclusive of the underlying MSA, the Court now turns its focus to the task of construing the policy and the MSA it incorporates in order to determine how much coverage Endeavor/Exxcel are entitled to. Texas law mandates that courts construe insurance policies according to ordinary contract principles, and interpretation of insurance policies is a question of law. *New York Life Ins. Co. v. Travelers Ins. Co.,* 92 F.3d 336, 338 (5th Cir.1996). The pri-

mary goal of contractual interpretation is to discern and give effect to the written expression of the parties' intent, which in turn requires the Court to read all parts of the contract together and to strive "to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." *Balandran v. Safeco Ins. Co. of Amer.,* 972 S.W.2d 738, 741 (Tex. 1998).

This case involves an MSA which contains an indemnity provision that expressly requires each party to obtain $5 million in total insurance coverage for the other party. The question in this case is how much insurance Defendants and Basic intended to provide Endeavor/Exxcel. The language of the contract is such that the Court can only answer the question one of two ways. Either Defendants intended to provide Endeavor/Exxcel with a total of $5 million of coverage, or Defendants intended to provide Endeavor/Exxcel all of the insurance coverage that they owed Basic under the Primary, First, and Second Excess policies. Defendants argue that the reference back to the "Insurance Contract" included in the insurance policies coupled with the fact that the "Insurance Contract" (MSA) clearly requires Basic to obtain a total of $5 million in coverage benefitting Endeavor/Exxcel conclusively reveals that Defendants only intended to provide enough coverage (i.e. $5 million) to bring Basic into compliance with its requirements as set out in the MSA.

Plaintiff offers a different interpretation. According to Plaintiff, "even though the parties could have limited the dollar amount of their contractual liability under the mutual indemnity obligations, no limit of liability was established by the MSA." (Dkt. No. 34-1 at 11). That is, Plaintiff contends that the MSA merely set out the minimum amount of coverage the parties had to obtain for one another. In light of

this fact, Plaintiff further argues that it is at least within the realm of possibility that Basic and Defendants intended to provide Endeavor/Exxcel $51 million in insurance coverage. As evidence of this possibility, Plaintiff cites the language that Ironshore included when Endeavor/Exxcel added Basic to its own umbrella policy (again to comply with the MSA). In that policy, Plaintiff boasts, it specifically stated that "the most we will pay for loss under this policy on behalf of any person or organization for whom you are obligated by this written insurance contract . . . is the lesser of the applicable limits of insurance . . . or the minimum of the limits of insurance you agreed to procure in such written insurance contract." (Dkt. No. 34–1 at 12).

■■■ If deemed true, or even plausible, Plaintiff's suggested understanding of the MSA and Defendants' intent is legally significant because in Texas, additional rules of interpretation apply where an insurance policy contains an ambiguous term or clause. *See Gomez v. Hartford Co. of the Midwest*, 803 S.W.2d 438, 441–42 (Tex. App.-El Paso 1991). Specifically, if the language is ambiguous, the Court would apply the doctrine of *contra proferentem* and construe the contract against the insurer. *Id.* "A contract is ambiguous if, after applying the rules of contract interpretation, a provision remains reasonably susceptible of two meanings." *Id.* Obviously, for this Court to even consider applying the doctrine of *contra proferentem*, the Court must actually determine that the disputed provisions are ambiguous since "the doctrine of *contra proferentem* is a device of last resort employed by courts when construing ambiguous contractual provisions." *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676–77 (Tex.App.-Austin 2003); *see also Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex.1984); *AT & T Corp. v. Rylander*, 2

S.W.3d 546, 559 (Tex.App.-Austin 1999). It is "essentially a tie breaking device used to prevent arbitrary decisions when all other methods of interpretation and construction prove unsatisfactory." *Evergreen*, 111 S.W.3d at 677. Importantly, however, "[a] policy is ambiguous only if it is susceptible to more than one reasonable interpretation." (R. 1612, citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc.*, 811 S.W.2d 552, 555 (Tex.1991)).

The doctrine of *contra proferentem* is inapplicable to this case since the Court finds that the contract is not subject to more than one reasonable interpretation. While Plaintiff asserts that the MSA only set out the minimum amount of insurance the parties had to provide one another, the Court's job is to enforce the intent of the parties as manifest at the time of the agreement. *Beaston*, 907 S.W.2d at 433. When Basic had Defendants add Endeavor/Exxcel as additional insureds to their insurance policies, it did so for the express purpose of complying with the underlying contract. Compliance required that Basic provide Endeavor/Exxcel with $5 million, and Plaintiff has not put forward any evidence which would lead the Court to believe that Basic intended to provide more coverage for Endeavor/Exxcel than they themselves were receiving from Endeavor/Exxcel in return. While Plaintiff appears to believe that its own behavior supports their claim that Defendants intentionally left out language that expressly limited the scope of their liability obligation to the $5 million set out in the contract, Plaintiff's inclusion of the limiting language actually cuts against its case since it demonstrates that its indemnity obligation under the very same MSA that is the subject of this case was only $5 million and that they only intended to provide $5 million of coverage. While the Court recognizes that it cannot conclusive-

ly rule out Plaintiff's argument that Defendants actually intended to provide take on \$46 million of additional risk above and beyond the amount their client needed them to assume per the terms of the contract, Plaintiff does not provide a single shred of evidence tending to support this most unlikely of scenarios. If anything, Plaintiff's own behavior highlights the fact that makes Plaintiffs "above and beyond" argument so fantastical: the Defendants, just like the Plaintiff, are in the risk management business. Thus to consider Plaintiffs argument reasonable, the Court would have to accept as plausible the idea that Defendants, who are insurance companies whose success is predicated on their ability to charge their clients as much money to take on as little risk as possible, intentionally assumed an extra \$46 million in risk without receiving anything in return. Plaintiff does not point to *any* evidence to suggest that Defendants intended to go above and beyond bringing their clients into compliance with the underlying MSA. While the Court applauds Ironshore's attorneys for drafting a more ironclad policy, the Court will not punish Defendants for not including that language when it is plain from the text of the insurance policy, the MSA, and the facts and circumstances surrounding the transaction that Defendants meant to provide Endeavor/Exxcel with only \$5 million of coverage.

## IV.  CONCLUSION

For the reasons set out above, the Court GRANTS Defendants' Motion for Summary Judgment (Dkt. No. 25) and DENIES Plaintiff's Motion for Summary Judgment (Dkt. No. 34). The Court further declares that the available limits of the insurance are \$5,000,000.00 as set forth in the MSA. It is further noted that the National Union Policy has exhausted its \$1,000,000 primary limit, thereby leaving only \$4,000,000 to contribute to the underlying lawsuit.

Finally, the Court DISMISSES all motions and relief requested not expressly ruled upon in this motion as MOOT.